NATIONAL ALFALFA DEHYDRATING AND MILLING COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1081–70.    Filed October 14, 1971.

*Charles W. Hess* and *James J. Melching*, for the petitioner.
*David A. Pierce*, for the respondent.

OPINION

SCOTT, *Judge:* Respondent determined a deficiency in petitioner's income tax for the fiscal year ended April 30, 1967, in the amount of $147,949.76.

The issue for decision is whether petitioner is entitled to a deduction for amortizable debt discount measured by the difference between the face value of its corporate bonds and the fair market value of its preferred stock which it received in exchange for the bonds.

All of the facts have been stipulated and are found accordingly.

National Alfalfa Dehydrating & Milling Co. (hereinafter referred to as petitioner or National Alfalfa) is a Delaware corporation with

its principal office at the time the petition in this case was filed in Shawnee Mission, Kans.

National Alfalfa filed its Federal corporate income tax return for the fiscal year ended April 30, 1967, with the district director of internal revenue, Wichita, Kans.

National Alfalfa was incorporated on May 4, 1946, to engage in the business of dehydrating and milling alfalfa.

Prior to July 23, 1957, it had 47,059 shares of its $50 par value cumulative preferred stock issued and outstanding. The dividend arrearages on each of these shares of preferred stock amounted to $10 as of July 23, 1957.

Petitioner's certificate of incorporation and the preferred stock certificates provided that the preferred stock was redeemable at stated prices depending on the redemption date. After December 1, 1955, the redemption price was $51.

On April 8, 1957, the board of directors of National Alfalfa passed a resolution which authorized $2,352,950 in 5-percent sinking fund debenture bonds to be issued by the corporation in exchange for its outstanding preferred stock and the increase in the par value of its common stock from $1 to $3 a share.[1]

The principal business purpose for the 1957 exchange of debentures for preferred stock was to enable National Alfalfa to expand its east-

---

[1] This resolution provided as follows with respect to the exchange of bonds for preferred stock:

"RESOLVED, that the President or Vice-President and the Secretary or Assistant Secretary of the Company be and they are hereby authorized to enter into a trust indenture with Fidelity-Philadelphia Trust Company of Philadelphia, Pennsylvania, dated, as of July 1, 1957, pursuant to the terms of which there shall be issued $2,352,950.00 principal amount 5% Debentures, due July 1, 1975, which said bonds shall be issued in exchange for shares of the 5% Cumulative Preferred Stock on the basis of $50.00 principal amount of such debentures for each share of preferred stock and that this resolution, when ratified by the shareholders shall constitute authority for said issue, and

"RESOLVED, that the Company be authorized to issue warrants for the purchase of the common stock of the Company to each preferred shareholder participating in the exchange of his preferred stock for Debentures of the Company in the reorganization effective August 1, 1957, on the basis of one warrant for each share of Preferred Stock surrendered, said warrants to evidence the right to purchase one-half (½) share of common stock and said warrants to be exercisable to purchase only full shares of common stock of the Company at a price of $10.00 per share at any time from the date of issue until July 1, 1969 or so long as any debenture bonds remain outstanding, after which date warrants will become void, and

\*    \*    \*    \*    \*    \*    \*

"RESOLVED, that this resolution and the reorganization and recapitalization contemplated hereby be submitted to a vote of the shareholders, and if adopted by the requisite number of shareholders, all rights and privileges of the 5% Cumulative Preferred Shares heretofore expressed or inherent in the ownership of said Preferred Stock shall cease and determine as of August 1, 1957 except such right to surrender the said shares of stock on the terms herein contained except as otherwise provided by law, and

"RESOLVED, that the officers of the Company are hereby authorized to submit the Plan of Reorganization to the Commissioner of Internal Revenue in an attempt to have the said Plan qualified as a tax free reorganization under the Internal Revenue Code of 1954, and"

ern producing areas. In order to expand into the eastern areas National Alfalfa's credit requirements for carrying inventory were increased by 50 percent. To improve National Alfalfa's credit status this transaction also included the issuance of certain warrents to the cumulative preferred shareholders which permitted the holder to purchase common stock of National Alfalfa at a stated price in order to eliminate the dividend arrearages owed to them. In addition, the cancellation of the preferred stock and elimination of the dividend arrearages, made it possible for National Alfalfa to declare dividends to the common stockholders thereafter.

An indenture dated July 1, 1957, was arranged between National Alfalfa and Fidelity-Philadelphia Trust Co., as trustee. On behalf of National Alfalfa, Fidelity-Philadelphia Trust Co. requested a ruling from the U.S. Treasury Department. In reply to this request a letter ruling dated May 29, 1957, was issued. This letter stated that no gain or loss would be recognized on the exchange of the $1 par value common stock for $3 par value common stock under the provisions of sections 368(a)(1)(E)[2] and 354(a) but gain or loss would be recognized to the preferred stockholders on the exchange of their preferred stock for debenture bonds.[3]

On July 23, 1957, the holders of cumulative preferred stock of National Alfalfa exchanged that stock for the debenture bonds of National Alfalfa due in 1975. Each unit of the debenture had a fixed maturity value of $50.

The preferred stock received by National Alfalfa in exchange for the debentures was retired and canceled upon the issuance of the bond

---

[2] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[3] The letter ruling stated as follows :

"(1) The exchange by the holders of $1. par value common stock for $3. par value common stock, on the basis described above, will constitute a recapitalization and, therefore, a reorganization, within the meaning of section 368(a)(1)(E), of the Internal Revenue Code of 1954. No gain or loss will be recognized to Company as a result of the exchanges.

"(2) No gain or loss will be recognized to the holders of common stock as a result of the exchange of common stock (section 354(a)). The basis to each stockholder of the stock received will be the same as the cost or other adjusted basis of the stock surrendered (section 358(a)). The holding period of the stock received will include the holding period of the stock surrendered in the exchange (section 1223).

"(3) Assuming but not determining that the 5% debenture bonds to be issued qualify as securities (create a genuine relationship of debtor and creditor), gain or loss will be recognized to the preferred stockholders from the exchange of 5% cumulative preferred stock, par $50., and the dividend arrearage thereon of $10. per share as of June 1, 1957, for debenture bonds and warrants to subscribe for the new common stock at $10. per share (section 302(a)). The gain or loss recognized from the exchange will be measured by the difference between the cost or other adjusted basis of the preferred stock surrendered and the fair market values of the debentures and warrants received and such gain or loss will constitute capital gain or loss subject to the applicable provisions and limitations of Subchapter P Part I of Subtitle A of the Code.

"The basis of the debentures and the warrants received by the holders of the old preferred stock will be the fair market values used in the determination of the recognizable gain or loss.

"(4) The fair market values prevailing on the date the Plan is declared effective are the values to be assigned to the debentures and the warrants received in the exchange."

indebtedness by an entry on National Alfalfa's books debiting preferred stock for $2,352,950 thereby completely eliminating the preferred stock account and crediting the liability account for 18-year 5-percent debentures for the same amount.

The preferred stock of National Alfalfa was quoted in the over-the-counter market during the period July 15 to July 30, 1957, as follows:

| Date | Bid | Offer | Date | Bid | Offer |
|------|-----|-------|------|-----|-------|
| July 15 | 33 | 35 | July 23 | 32 | 34 |
| July 16 | 32 | 35 | July 24 | 32 | 35 |
| July 17 | 32 | 34 | July 25 | 29 | 32 |
| July 18 | 31 | 34 | July 26 | 30 | 33 |
| July 19 | 32 | 34 | July 29 | 30 | 33 |
| July 22 | 31 | 33 | July 30 | 30 | 33 |

The National Stock Summary dated October 1, 1957, shows 100 shares of National Alfalfa wanted on July 9, 1957, at $32 and 100 shares wanted on July 10, 1957, at $33, and 100 shares offered on July 10, 1957, at $35.

On its Federal income tax returns for its fiscal years ended April 30, 1958, through April 30, 1967, National Alfalfa claimed deductions for debt discount expense and in computing the amount of the claimed deduction used a fair market value of $33 per share for the preferred stock exchanged for the bonds. The difference of $800,003 between the face value of the debentures ($2,352,950) and the fair market value of the preferred stock (47,059 shares times $33 per share) ($1,552,947) was amortized over the years 1957 through 1975 and appropriate amounts were taken as deductions each year through April 30, 1967.

The deduction claimed by National Alfalfa each year for debt discount was computed on the basis of the total of two different variables:

1. The unamortized discount of bonds redeemed or repurchased and retired by National Alfalfa in the year of the deduction, and

2. The annual straight line amortization on those bonds still outstanding at the end of the year.

The amounts of deduction for discount taken by National Alfalfa on its Federal income tax returns for its fiscal years ended April 30, 1958, through April 30, 1967, are as follows:

| Year ended Apr. 30— | Unamortized discount on bonds currently repurchased or redeemed | Straight-line amortization | Total |
|---|---|---|---|
| 1958 | 0 | $37,037 | $37,037 |
| 1959 | $20,104 | 43,273 | 63,377 |
| 1960 | 17,007 | 42,310 | 59,317 |
| 1961 | 0 | 28,743 | 28,743 |
| 1962 | 14,062 | 27,751 | 41,813 |
| 1963 | 0 | 27,751 | 27,751 |
| 1964 | 26,624 | 25,562 | 52,186 |
| 1965 | 37,903 | 22,168 | 60,071 |
| 1966 | 4,139 | 21,761 | 25,900 |
| 1967 | 98,824 | 10,980 | 109,804 |
| Total | | | 505,999 |

As required by the indenture a sinking fund was established in order to secure funds to redeem the debenture bonds. In lieu of making all or any part of the sinking fund payments in cash National Alfalfa is also authorized by the terms of the indenture in article VI to deliver outstanding debentures to the sinking fund trustee which have either been redeemed or purchased by National Alfalfa on the open market.

National Alfalfa has at all times been on schedule following the provisions of the sinking fund and is not now nor has at any time pertinent hereto been in default of any of the terms of the indenture. As of April 30, 1967, only 11,626 of the original 47,059 debenture bonds of National Alfalfa remained outstanding, as a result of the sinking fund trustee and National Alfalfa having redeemed or otherwise repurchased and retired the other 35,433 debentures.

Respondent in his notice of deficiency disallowed petitioner's claimed deduction of $109,804 for amortization of bond discount for its fiscal year ended April 30, 1967, and also disallowed $321,657 of claimed loss carryovers from prior years based on the disallowance of petitioner's claimed deductions for amortization of bond discount for its fiscal years ended April 30, 1958, through April 30, 1966.

Petitioner contends that since the maturity value of its debenture bonds issued in exchange for its preferred stock was in excess of the fair market value of the preferred stock it received, the difference is discount which may be prorated or amortized over the life of the bonds and deducted under section 163.

Respondent's position is that the transaction in which petitioner exchanged the bonds for preferred stock was a tax-free recapitalization under section 368(a)(1)(E) in which gain or loss is not recognized. Respondent argues that the difference in the face amount of the bonds and the fair market value of the stock is nonrecognizable loss. Respondent also argues that petitioner's issuance of bonds for its own preferred stock was a redemption of the preferred shares and that under the provisions of section 311(a)(2), no gain or loss shall be recognized by a corporation on such a distribution. Finally, respondent contends that in any event no bond discount arises when a taxpayer issues its bond in exchange for its stock of a par value equal to the face value of the bond and then cancels the stock.

It is well established that debt discount arising from the issuance of bonds or debt obligations at a price below their par or maturity value is deductible. Respondent's regulations providing that the deduction for bond discount is to be prorated over the life of the bonds [4] has been recognized as valid. *Helvering* v. *Union Pacific Co.*,

---

[4] Sec. 1.163–3, Income Tax Regs. (T.D. 6984, filed 12/23/68, 1969–1 C.B. 39). Deduction for bond discount.

(a) *Discount upon issuance.* (1) If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over

293 U.S. 282 (1934). However, there is a division of authority with respect to the question of whether original issue discount can arise where bonds are issued for something other than cash.[5]

Respondent's arguments based on section 368(a)(1)(E) and section 311(a)(2) need not be discussed since we are disposing of this case in his favor on another issue.

The major contention of respondent is that in a transaction where a corporation exchanges its bonds for its stock which it then cancels, no bond discount arises. Respondent argues that petitioner did not issue its bonds for "property" but rather merely replaced its paid-in capital represented by its preferred stock by paid-in capital represented by its bonds. Respondent relies on *Erie Lackawanna Railroad Co.* v. *United States*, 422 F. 2d 425 (Ct. Cl. 1970), and *Missouri Pacific Railroad Co.* v. *United States*, 427 F. 2d 727 (Ct. Cl. 1970), modified on rehearing 433 F. 2d 1324 (Ct. Cl. 1970), in support of his position. Petitioner attempts to distinguish *Missouri Pacific Railroad Co.* v. *United States*, *supra*, from the present case on its facts. In the *Missouri Pacific* case, bonds of a reorganized company were exchanged for bonds of that company and stocks and bonds of a subsidiary. The court held that no debt discount arose where the old bonds and stocks and bonds of the subsidiary received in the exchange were equal in face amount to the new bonds issued. Petitioner contends there was no "qualitative" difference in the securities exchanged in the *Missouri Pacific* case whereas in the instant case there is a "qualitative" difference in the bonds issued by petitioner and the preferred stock exchanged for those bonds. Petitioner does not contend that the facts in *Erie Lackawanna Railroad Co.* v. *United States*, *supra*, which held that no debt discount arose on the issuance of the taxpayer's bonds for stock in equal face amounts, are distinguishable from the facts in the instant case but argues that the conclusion in that case that the issue price of the stock rather than its market value is the amount to be used in determining whether discount has arisen on the exchange of the bonds for the stock is without a rational basis.[6]

the life of the bonds. For purposes of this section, the amortizable bond discount equals the excess of the amount payable at maturity (or, in the case of a callable bond, at the earlier call date) over the issue price of the bond (as defined in paragraph (b)(2) of sec. 1.1232–3).

Sec. 1.163–3(d) replaced regs. sec. 1.61–12(c) which as in effect in 1967 and for many years prior thereto provided in part:

If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds. * * *

[5] See fn. 8, *infra*.

[6] We have not discussed petitioner's "what might have been" argument. This argument by petitioner in effect is that if it had issued the bonds for $33 in cash and used the $33 to purchase its outstanding preferred stock, the net result would be the same as an exchange of the bonds for the stock, but there would be no question that it would be entitled to deductions for amortizable bond discount. The simple answer to this contention is that it is not what happened. However, the assumption is not based on any evidence in this case.

In our view there is no distinction in substance between the facts in either the *Erie Lackawanna* case or the part of the *Missouri Pacific* case dealing with the exchange of bonds of the new company for bonds of the old company and the instant case. In the *Erie Lackawanna* case when the taxpayer exchanged its $100 debenture bonds for its preferred stock with a par value of $100 and canceled the stock received in the exchange, the fair market value of the stock was less than $100. In holding that the "amount paid for the preferred stock should be considered as the cost of the bond" the Court stated that since the taxpayer had originally received $100 for the preferred stock, it was not "hurt" as a result of the transaction. The court in the *Missouri Pacific* case extended its holding in *Erie Lackawanna* to cover a bonds-for-bonds exchange and bonds exchanged for stock and bonds of a subsidiary. In that case the court held bond discount to be available where the amount originally paid for bonds was less than the face amount of the bonds issued by the taxpayer in the exchange.[7] Again, the Court looked to the payment received by the taxpayer when the original stocks or bonds were issued to determine whether debt discount arose. In both *Erie Lackawanna* and *Missouri Pacific*, the court noted that it was not considering the general question of whether debt discount can arise in transactions in which bonds are issued for property.[8] We are impressed with the reasoning of the Court in *Erie*

There is no evidence in this case to show at what price the bonds might have been sold on the open market had they been issued and put up for sale for cash. Also, there is no evidence to indicate that petitioner would have been able to purchase all of its preferred stock on the open market or at what price that quantity of stock could have been purchased other than the $51 at which it could be redeemed.

[7] In the case of certain stock which had an issue price less than the face amount of the bonds but a worth greater than such issue price, the court held on rehearing that no bond discount arose from the transaction. In its opinion on the motion for rehearing the court held the face amount of the stock to be the "floor" but not the "ceiling" in calculating whether the bonds issued for the stock were issued at a discount.

[8] In *Erie Lackawanna Railroad Co.* v. *United States*, 422 F. 2d 425, 430–431 (Ct. Cl. 1970), the following statement was made as to this question:

"In addition, we have failed to consider the conflict of whether debt discount can arise in instances where bonds are issued for property. Since we feel that, in the bond discount area, a corporation's own stock comprises a category completely separate from cash and other types of property, we have found it unnecessary and indeed unwise to involve ourselves, at this time, in this rather sticky issue. *Compare* Nassau Lens Co. v. Commissioner, *supra;* American Smelting & Ref. Co. v. United States, *supra;* Industrial Dev. Corp. v. United States, *supra;* with Southern Natural Gas Co. v. United States, *supra;* Montana Power Co. v. United States, 159 F. Supp. 593, 141 Ct. Cl. 620, cert. denied, 358 U.S. 842, 79 S.Ct. 23, 3 L.Ed. 2d 76 (1958) ; Montana Power Co. v. United States, 232 F. 2d 541 (3d Cir.), cert. denied, 352 U.S. 843, 77 S.Ct. 51, 1 L.Ed.2d 59 (1956) (dictum). Instead, we feel that the problem can be better resolved when a case arises in which bonds are exchanged for property other than the stock of the issuing corporation."

In *Missouri Pacific Railroad Co.* v. *United States*, 427 F. 2d 727, 731 fn. 7 (Ct. Cl. 1970), the conflict of authority on this issue was discussed as follows:

"[7] We do not mean to imply by this statement that we are now holding that debt discount is available where bonds are issued for property (other than the corporation's own securities). In fact there appears to be a definite split of authority on this question with Nassau Lens Co. v. Commissioner of Internal Revenue, 308 F. 2d 39 (2d Cir. 1962), and American Smelting & Ref. Co. v. United States, 130 F.2d 883 (3d Cir. 1942), holding

*Lackawanna* and *Missouri Pacific*. The rationale of our holdings in *375 Park Avenue Corporation*, 23 B.T.A. 969 (1931), and *Liquid Carbonic Corporation*, 34 B.T.A. 1191, 1196 (1936), and cases there cited, support the reasoning in those Court of Claims' cases. In the *375 Park Avenue* and *Liquid Carbonic* cases, we concluded that where bonds were retired by a corporation by issuance of its stock, the transaction did not amount to "payment" of the bonds so as to entitle the corporation to deduct unamortized bond discount and that no loss to the corporation resulted from the transaction. The instant case, as well as the *Erie Lackawanna* and *Missouri Pacific* cases, is obviously actually distinguishable from the *375 Park Avenue* and *Liquid Carbonic* cases. However, the same reasoning that supports the conclusion that retiring a bond by issuing stock for it is not equivalent to payment of the bond in cash or property other than stock of the corporation retiring the bond also supports the conclusion that a bond issued for a corporation's own preferred stock, par for par, has not been issued at a discount. The payment received by the corporation for the bond is the amount originally paid in for the stock. The transaction from the corporation's standpoint is merely the exchange of one form of interest in the corporation for another. We recognize, as petitioner contends, that petitioner was not obligated to pay back to its preferred stockholders the $50 they had paid in for the stock except upon redemption of the stock or liquidation of the company and that upon liquidation the payment would be subordinate to the payment to creditors of the corporation. These facts may affect the value of the stock as compared to the bond but they do not affect the amount paid to the corporation for the bond. The stock had no "value" to petitioner aside from the $50 it had originally received for it. This is the rationale of the *Erie Lackawanna* and *Missouri Pacific* cases. Bonds issued in exchange for stock or bonds of the issuing company are distinguishable from bonds issued for a type of property which was never represented by a previous cash payment to the issuing com-

that debt discount is available where bonds are issued for property, and Southern Natural Gas Co. v. United States, 412 F.2d 1222, 188 Ct.Cl. 302 (1969), Montana Power Co. v. United States, 159 F. Supp. 593, 141 Ct.Cl. 620, cert. denied 358 U.S. 842, 79 S.Ct. 23, 3 L.Ed. 2d 76 (1958), and Montana Power Co. v. United States, 232 F.2d 541 (3d Cir.), cert. denied 352 U.S. 843, 77 S.Ct. 51, 1 L.Ed.2d 59 (1956) (dictum), stating that debt discount is not so available. We are simply saying that, as between the situation where a corporation issues bonds for its own securities and where a corporation issues bonds for other types of property, we can better understand how fair market value could be applied to the latter situation but not to the former—assuming, for the moment, that debt discount would be available in the latter situation."

Sec. 1232(b)(2) defining issue price of bonds was amended by sec. 413(b) of the Tax Reform Act of 1969, Pub. L. 91–172, "In order to clarify the situations in which original issue discount may arise." S. Rept. No. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 517. This provision is made applicable to bonds issued after May 27, 1969, other than those issued pursuant to a written commitment binding on May 27, 1968, and at all times thereafter. Sec. 413(e), Pub. L. 91–172.

pany and which is retained by the issuing company.[9] After the transaction here involved, which included the issuance of the bonds and the cancellation of the stock, was completed petitioner had no "property" paid for its bonds unless the $50 paid in for the stock is the property paid in for the bonds.

Since we agree with the conclusions in the *Erie Lackawanna* and *Missouri Pacific* cases, and those conclusions are in effect supported by our decisions in *375 Park Avenue Corporation*, supra, and *Liquid Carbonic Corporation*, supra, we would without further discussion apply that reasoning in the instant case and hold that petitioner's bonds were not issued at a discount, except for the recent decision of the U.S. Court of Appeals for the Tenth Circuit to which an appeal in this case would lie, in *Atchison, Topeka & Santa Fe R. Co.* v. *United States*, 443 F. 2d 147 (C.A. 10, 1971). The *Atchison, Topeka & Santa Fe* case involved a deduction for bond discount claimed by the taxpayer for the year 1950 on its 100-year debenture bonds issued in 1895. The bonds had been issued in a reorganization, the face amount of the new bonds being equal to the face amount of old bonds which were surrendered as a part of the reorganization but greater than the fair market value of the old bonds. The Government contended that the bonds of the taxpayer (the new company in the reorganization) were issued in partial payment for the physical properties of the old company in the amount of the purchase price of the assets for which issued and therefore no discount was incurred. The court held that the sale of the assets for the bonds was merely one step in a reorganization and

---

Sec. 1232(b)(2) as amended by the 1969 Tax Reform Act applicable to bonds issued after May 27, 1969 (sec. 413 of Pub. L. 91–172), provides in part:

In the case of a bond or other evidence of indebtedness, or an investment unit as described in this paragraph (*other than a bond or other evidence of indebtedness or an investment unit issued pursuant to a plan of reorganization within the meaning of section 368(a)(1)* or an insolvency reorganization within the meaning of section 371, 373, or 374), which is issued for property and which—

 (A) is part of an issue a portion of which is traded on an established securities market, or

 (B) is issued for stock or securities which are traded on an established securities market,

the issue price of such bond or other evidence of indebtedness * * * shall be the fair market value of such property. Except in cases to which the preceding sentence applies, the issue price of a bond or other evidence of indebtedness * * * which is issued for property (other than money) shall be the stated redemption price at maturity.

[Emphasis supplied.]

This provision is, of course, not applicable to the instant case. If it were applicable, respondent's argument under sec. 368(a)(1)(E) would have relevance whether bond discount is considered to be deductible as interest or as loss and we would dispose of the case by determining that the bonds were issued pursuant to a plan of reorganization under sec. 368(a)(1)(E) even though the exchange was not one in which there was nonrecognition of gain or loss.

Respondent in his reply brief states that in the instant case he is not contending that bond discount can never arise where bonds are issued for property but only that no such discount arises under the facts of this case.

[9] See fn. 8 for similar comments in the *Missouri Pacific* case.

affirmed the holding of the lower court that the taxpayer's bonds had been issued in exchange for bonds of the old company. In the alternative the Government contended that even assuming the bonds of the taxpayer were exchanged for the bonds of the old company, no discount arose "because none may be imputed where discount is not specified in a bonds-for-property exchange." The court rejected the Government's contention and concluded that since the face amount of the bonds issued by the taxpayer exceeded the fair market value of the old bonds for which they were exchanged, "economic and business reality" conforms with the view that to the issuer bond interest is reflected both in the stated rate of interest and by the amount below par received by the issuer when the bonds are distributed. The court in reaching its conclusion cited the *Missouri Pacific* case and the *Erie Lackawanna* case in a footnote but did not discuss either of those cases. The court's discussion of the issue of whether bond discount might arise when a company exchanged new bonds for old bonds in a reorganization consisted of the following paragraph (443 F. 2d at 152–153):

> Perhaps the strongest authority the Government cites for its arguments that discount may not arise in a bonds-for-property transaction is the analysis in an opinion by Judge Kalodner, joined by Judge Staley, in Montana Power Co. v. United States, 232 F. 2d 541, 545 (3rd Cir. 1956), in which the other five members of the Court sitting *en banc* did not join. Upon reviewing the history and rationale of the Regulation authorizing the deduction for bond discount and cases considering the Regulation, Judge Kalodner concluded that the Regulation was never intended to be applicable in a bonds-for-property transaction. The position expressed by Judge Kalodner was adopted by the Court of Claims in Montana Power Co. v. United States, 159 F. Supp. 593 (1958).[5] However, the contrary view of Judge Goodrich in American Smelting & Refining Co. v. United States, 130 F. 2d 883, 885 (3rd Cir. 1942), is more persuasive: "We believe that the discount is still to be treated as additional interest when the subject matter of the loan is stock instead of cash." Accord, Nassau Lens Co. v. United States, 308 F. 2d 39, 44 (2nd Cir. 1962); Industrial Development Corp. v. United States, 51 A.F.T.R. 1514 (N.D. Ill. 1966); Southern Fertilizer & Chem. Co. v. Edwards, 16 F. Supp. 879 (M.D. Ga. 1955).

---

[5] But compare *Erie Lackawanna R. R.* v. *United States,* 422 F. 2d 425, 430, 190 Ct. Cl. 682 (1970) and *Missouri Pacific R. R.* v. *United States,* 427 F. 2d 727, 731 (Ct. Cl. 1970).

Respondent attempts to distinguish the *Atchison, Topeka & Santa Fe* case from the instant case on its facts, primarily by the statements that (1) "The Court is a bit ambivalent as to whether the 'new' company issued its bonds for the bonds of the old company or for the property of the old company" and (2) "What the 'new' company received for its stock and debentures was the assets of the old company, including the newly invested capital, subject to the liabilities which resulted from the negotiations."

Respondent follows his statements by an argument that the *Atchison, Topeka & Santa Fe* case involved an entity purchasing the assets of another corporation which purchased the bonds to merge them with the assets of the old company because the bonds were liens on those assets. Respondent contends that these facts distinguish the *Atchison, Topeka & Santa Fe* case from the instant case.

Finally, respondent argues that the decision in the *Atchison, Topeka & Santa Fe* case if not factually distinguishable from this case, is invalid.

The court in *Atchison, Topeka & Santa Fe* stated the Government's first argument to be "that as a matter of law taxpayer's bonds were issued in partial payment of the negotiated and agreed purchase price for the assets of the old company, in substance as well as in fact, and therefore no discount was incurred." The court rejected this argument of the Government before discussing the Government's alternative argument. The Tenth Circuit's rejection of this contention of the Government must be viewed in the light of the statements made by the trial court to the jury when the case was submitted to the jury by the District Court. (*The Atchison, Topeka & Santa Fe Railway Co.* v. *United States,* an unreported case (D. Kans. 1969, 24 A.F.T.R. 2d 69–5963, 69–2 U.S.T.C. par. 9740).)[10]

The distinction in the *Atchison, Topeka & Santa Fe* case and the instant case is that in the former no argument was presented by the Government or considered by the Court as to whether in fact the "property" received by the new company for its bonds was the "bonds

---

[10] The following are excerpts from the trial court's charge to the jury in *Atchison, Topeka & Santa Fe Railway Co.* v. *United States,* an unreported case (D. Kans. 1969, 24 A.F.T.R. 2d 69–5963, 69–2 U.S.T.C. par. 9740) :

"The Court has held as a matter of law that the one hundred year general and adjustment mortgage bonds issued in 1895 by the plaintiff (Atchison, Topeka and Santa Fe Railway Company), were exchanged for the general mortgage bonds issued by the 'old company' (Atchison, Topeka and Santa Fe Railroad Company). It is for you, the jury, to determine as a matter of fact (1) whether the exchange of the bonds of the Railway Company (referred to as 'the new bonds') for those of the Railroad Company (the old bonds) gave rise to a discount; and (2) the amount of such discount.

"So the factual issues remaining for you to decide in this case are:

"1. What was the fair market value of the old company's bonds which plaintiff received in exchange for its general and adjustment mortgage bonds?

"2. If the fair market value of the bonds received was less than the principal amount of said bonds, that is, less than $147,620,250, was all or any part of the difference discount?

\*    \*    \*    \*    \*    \*    \*

"There is no burden upon the government to prove that it is correct in retaining the taxes paid by the plaintiff with its income tax return. Rather, the burden is upon the plaintiff to establish by a preponderance of the evidence that the fair market value of the old general mortgage bonds was less than the par value of the new general and adjustment mortgage bonds. Plaintiff must also establish by a preponderance of the evidence that such a difference, or any part of such difference, was discount. In order to do this, plaintiff must show by a preponderance of the evidence that its general and adjustment mortgage bonds were issued under circumstances which would be equivalent of a discount. In other words, that the circumstances surrounding the issuance of its bonds were typical of the circumstances that might compel a corporation to discount its bonds."

of the old company at their fair market value" or the money originally paid for those bonds. For this reason the *Atchison, Topeka & Santa Fe* case is as a matter of law distinguishable from the instant case, the *Erie Lackawanna* case, and the *Missouri Pacific* case. We will not speculate on what conclusion the Tenth Circuit would have reached in *Atchison, Topeka & Santa Fe*, had the issue presented to it been issuance of new bonds for old bonds of the same company as distinguished from issuance of bonds for other property. The case of *American Smelting & Refining Co.* v. *United States*, 130 F. 2d 883 (C.A. 3, 1942), was the only case discussed by the court in *Atchison, Topeka & Santa Fe* which involved an exchange of bonds for stock or securities. That case involved bonds exchanged for stock of a subsidiary which the court deciding that case considered to be the same as any other property. Because the issue presented to us differs from the legal issues presented to and decided by the Tenth Circuit in the *Atchison, Topeka & Santa Fe* case, we do not consider our holding in *Jack E. Golsen*, 54 T.C. 742 (1970), affirmed 445 F. 2d 985 (C.A. 10, 1971), to require us to hold for petitioner in the instant case on the basis of the decision of the Tenth Circuit in the *Atchison, Topeka & Santa Fe* case. In *Jack E. Golsen* (54 T.C. at 757), we held that we are required to "follow a Court of Appeals' decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." For the reasons we have heretofore discussed we do not consider the decision of the Tenth Circuit in *Atchison, Topeka & Santa Fe* to be "squarely in point" with the instant case.[11]

---

[11] If we attempted to follow precisely the holding of the Tenth Circuit in *Atchison, Topeka & Santa Fe*, even though that holding was arrived at without consideration of one of the primary issues presented in the instant case, it would not follow that we would conclude that petitioner's bonds were issued at a discount of $17 a bond, for which discount petitioner contends. In the *Atchison, Topeka & Santa Fe* case the questions of the fair market value of the old company's bonds which the taxpayer received in exchange for its bonds, and if the fair market value of the old bonds was less than the principal amount of the new bonds whether any part of the difference was bond discount, were left to the jury. In the instant case respondent apparently does not contend that the fair market value of the preferred stock was other than $33 a share in July based on asked and bid prices for small quantities but does contend that this price in no way indicates the fair market value of the bonds had they been put up for sale for cash. Under the holding of the court in the *Atchison, Topeka & Santa Fe* case, we would have to determine whether all of the circumstances surrounding the issuance of the bonds were "typical of the circumstances that might compel a corporation to discount its bonds." Our conclusion that under the circumstances of this case the $50 originally paid in for the preferred stock is the amount to be considered as paid in for the debenture bonds, might be considered to be a holding that no part of any difference which might exist between the fair market value of the National Alfalfa preferred stock and the face amount of the bonds issued in exchange therefor has been shown to be bond discount under the circumstances surrounding the issuance of the bonds in this case. If our conclusion that the bonds under the circumstances of this case were not issued at a discount is considered to be such a holding, then our conclusion in the instant case is supported by, and in no way in conflict with the *Atchison, Topeka & Santa Fe* case. There is no affirmative evidence in this case of circumstances surrounding the issuance of the bonds which would indicate what the fair market value of the bonds were at the time they were issued.

**58**

We therefore conclude that petitioner is not entitled to bond discount amortization based on the difference in the $50 face value of its bonds issued in exchange for its preferred stock and the fair market value of the stock at the date of issue of the bonds but rather that the bonds were issued for stock which represented a $50 payment to petitioner.

Reviewed by the Court.

*Decision will be entered for respondent.*